1

2

3

4

5

6

7

8

9              UNITED STATES DISTRICT COURT

10                 EASTERN DISTRICT OF CALIFORNIA

11

HENRY BELTRAN,                    )    1:04-CV-05506 OWW SMS HC
12                                )
                    Petitioner,   )
13                                )    FINDINGS AND RECOMMENDATION
       v.                         )    REGARDING PETITION FOR WRIT OF
14                                )    HABEAS CORPUS
                                  )
15  JAMES YATES, Warden,          )
                                  )
16                  Respondent.   )
                                  )
17  _____   )

18        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19  pursuant to 28 U.S.C. § 2254.

20                          **BACKGROUND**

21        Petitioner is currently in the custody of the California Department of Corrections pursuant to

22  a judgment of the Superior Court of California, County of Fresno, following his conviction by jury

23  trial of one count of attempted voluntary manslaughter in violation of California Penal Code §§ 664,

24  192(a) with a finding that Petitioner personally used a firearm resulting in great bodily injury for the

25  benefit of a criminal street gang in violation of California Penal Code §§ 12022.5(a), 12022.7(a), and

26  186.22(b)(1). (CT[1] 320-321.)  In addition, Petitioner was found guilty of assault with a firearm in

27

28        _____

          [1]"CT" refers to the Clerk's Transcript on Appeal lodged with the Court by Respondent.

1  violation of California Penal Code §§ 245(a)(2), 12022.5(a). (CT 322.) On March 21, 2001,

2  Petitioner was sentenced to a total determinate term of twenty-five years and ten months in state

3  prison. (CT 567-569.)

4      Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

5  (hereinafter "Fifth DCA"), on April 19, 2001. (CT 570.) On January 23, 2003, the Fifth DCA

6  affirmed the judgment in all respects. See Exhibit A, Respondent's Answer.

7      Petitioner then filed a petition for review in the California Supreme Court. See Exhibit B,

8  Petitioner's Amended Petition. The petition for review was summarily denied on April 9, 2003. See

9  Exhibit A, Petitioner's Amended Petition.

10      On March 30, 2004, Petitioner filed a petition for writ of habeas corpus in this Court. On

11  June 24, 2004, Respondent moved for summary dismissal of the petition. The District Court granted

12  Respondent's motion on October 20, 2004, and granted Petitioner leave to file an amended petition.

13  On December 9, 2004, Petitioner filed the instant amended petition. The petition presents the

14  following four claims for relief: 1) "Judgment should be reversed because the motion to sever

15  Petitioner's two (2) cases was wrongly denied"; 2) The judgment should be reversed because the

16  prosecutor elicited inadmissible evidence, improperly drew attention to Petitioner's failure to testify,

17  and misled the jury about the duties of a defense attorney"; 3) The gang enhancement should be

18  reversed because of Sengpadychith error"; and 4) "Petitioner contends that California State Supreme

19  Court abused its discretion."  Following a preliminary review of the petition, on January 7, 2005,

20  then-Magistrate Judge Lawrence J. O'Neill issued a Findings and Recommendation which

21  recommended Grounds Three and Four of the amended petition be dismissed. The District Court

22  adopted the Findings and Recommendation on March 15, 2005.

23      On June 3, 2005, Respondent filed an answer to the petition. Respondent concedes Petitioner

24  has exhausted his state remedies as to the two remaining claims. However, Respondent contends that

25  the two claims are conclusory and unsupported by evidence such that they should be dismissed.

26  Petitioner filed a traverse on August 5, 2005.

27  ///

28  ///

# FACTUAL BACKGROUND

The Court hereby adopts the factual summary of the case as set forth by the 5th DCA in its opinion of January 22, 2003:

On April 18, 1999, Martin Ramirez was shot at and narrowly escaped being wounded while standing in the front yard of Michelle R.'s home on Illinois Street in Fresno. On May 2, 1999, Gilbert Arteaga and Richard Cruz were shot near Illinois Street. Arteaga was wounded in the head and lost his right eye. Cruz was fatally shot three times in the back.

[Petitioner] Henry Beltran was charged with assault with a firearm on Martin Ramirez, attempted murder of Gilbert Arteaga, and murder of Richard Cruz. He was convicted of the assault charge, found guilty of the lesser offense of attempted voluntary manslaughter, and found not guilty of murdering Cruz.

On appeal, [Petitioner] contends the court improperly granted the prosecution's motion to consolidate the assault case with the murder and attempted murder charges; the prosecutor committed prejudicial misconduct; and the jury was incorrectly instructed as to consideration of the gang enhancement.

**Count III - April 18, 1999**

In April 1999, Michelle R. lived on East Illinois Street in Fresno with her siblings, Myra and Eduardo. Augustine "Augie" Perez, her boyfriend, was a member of the West Fresno Nortenos (WFN) gang and affiliated with the Chicale Boys (TCB) gang.

On April 18, 1999, Michelle R. had a fight with "Jessica" around 3:00 p.m. or 4:00 p.m. The fight occurred near Seventh and Nebraska Streets, about three blocks from her house. Michelle admitted she used to associate with the Bulldog gang, but denied gang membership at the time of the fight. Michelle testified there were several people at the fight who were associated with gangs, including Gilbert Arteaga, who was a member of TCB, and Augie Perez. Michelle's siblings were present but they are not gang members. Michelle testified Jessica claimed membership in the Bulldog gang. Michelle thought her friends got into another fight with an unknown "kid" at the scene.

Michelle testified that after the fight, everyone went to her house on Illinois Street, except for Gilbert Arteaga. Around 6:30 p.m. or 7:00 p.m., Michelle was in the front yard with her siblings, Myra and Eduardo; her boyfriend, Perez; and Gilbert's brother, J.A., who was a member of TCB. Michelle observed [Petitioner] Henry Beltran approach the house and stand in the middle of Illinois Street. Michelle knew [Petitioner] as "Stump," and testified he had a dog paw tattoo on his ear which associated him with the Bulldog gang. She also knew [Petitioner] had an "MSD" tattoo for the McKenzie Street Dogs, a gang associated with the Bulldogs.

Michelle testified [Petitioner] was standing in the street with another person, who pulled out a gun. She did not know this person's identity, but recognized him as the person who was with Jessica earlier that day. Michelle testified when this person pulled the gun, he either handed it to [Petitioner] or [Petitioner] took it from him. Michelle testified [Petitioner] fired the gun in the direction of Martin Ramirez, who was running toward Michelle's house from his girlfriend's house, across the street. Michelle believed [Petitioner] fired the gun twice from about 30 feet away, and testified Ramirez was "scraped" by a bullet.

Martin Ramirez initially fell to his knees, then scrambled to his feet and tried to chase [Petitioner]. Augie Perez and J.A., who were inside Michelle R.'s house when the shots were

1  fired, ran out with sticks and baseball bats and chased the gunman.

2  Michelle didn't think [Petitioner] intentionally meant to shoot at anyone because he
3  didn't aim and point the weapon at a particular person. Instead, Michelle believed [Petitioner]
   just meant to scare them. Michelle testified [Petitioner] didn't shout anything, and no one ran
   toward him as he fired. Michelle was nervous about testifying because she was afraid of
4  retaliation from [Petitioner]'s gang, the Bulldogs. Michelle believed Martin Ramirez went to
   Mexico after he was shot.

5

6  Eduardo R. testified that his sister Michelle was standing in the front yard of their
   house with Martin Ramirez, J.A., and some friends of Augie Perez. Michelle was standing
   behind Martin Ramirez, who had been at their house for about 30 minutes. Eduardo observed
7  six to seven people walk down the street and stand in the middle of Illinois Street, and he
   identified [Petitioner] as one of the people in this group. Eduardo testified that someone in
8  the group produced a handgun from his waistband and gave it to [Petitioner]. [Petitioner]
   fired one or two shots at the people in Eduardo R.'s front yard. Martin Ramirez fell to the
9  ground, and [Petitioner] and his associates ran away. Martin and his friends immediately
   chased the group through the neighborhood.

10

11 Eduardo believed [Petitioner] used a black handgun. Eduardo also believed a person
   known as "Puppet" gave [Petitioner] the handgun before he fired. Eduardo further testified
   J.A., Gilbert Arteaga, Martin Ramirez, and Augie Perez were TCBs.

12

13 Martin Ramirez testified he was visiting his girlfriend, Taina, who lived across the
   street from Michelle R.'s house. Martin and Taina were standing outside when his friends,
14 J.A. and Augie Perez, asked him to come over to Michelle R.'s house because they had
   problems. Martin ran over and noticed Michelle R. was hiding behind her friends. Martin
15 testified there was a group of six or seven people standing in the middle of Illinois Street in
   front of Michelle R.'s house, and identified [Petitioner] as part of this group. Martin testified
16 [Petitioner]'s group was looking for problems with his friends, and someone asked Martin if
   he was a Bulldog. Martin replied no.

17

18 Martin testified that a light-complexioned person with [Petitioner]'s group produced a
   handgun but seemed too afraid to fire it. Martin testified [Petitioner] said, "'Let me have the
   gun to fire at him.'" [Petitioner] took the gun and fired two shots at Martin. Martin testified
19 a bullet grazed his shirt and left a hole in it, but Martin's body was not hit by any bullets.
   Martin hit the ground to avoid the gunshots then ran away.

20

21 At trial, Martin positively identified [Petitioner] as the man who shot him. At the time
   of the shooting, Martin associated with the Norteno gang, which was affiliated with the
   TCBs. Martin did not have any prior problems with the Bulldogs but his TCB friends were
22 having problems.

23 Martin testified he spoke to Michelle R. later that night, and learned the police wanted
   to speak with him about the shooting. However, Martin's family sent him to Mexico because
24 they didn't want him involved with the gangs. Martin later called the police from Mexico and
   returned to Fresno County to testify in the case.

25 Taina R. testified Martin visited her that evening, and they were outside her house
   when he asked for some water. Taina went inside and returned with the water, but Martin had
26 gone down the street to Michelle R.'s front yard. Taina testified that [Petitioner] was standing
   in Illinois Street with two friends. [Petitioner] was arguing with J.A., who was standing in
27 Michelle's front yard. Taina testified one of [Petitioner]'s friends produced a small chrome
   gun and handed it to [Petitioner]. Taina testified [Petitioner] aimed the weapon toward
28 Martin, J.A., and several others who were standing in front of Michelle's house, and

[Petitioner] fired the gun one time. [Petitioner] and his friends ran past Taina as they fled the scene, and Taina could still see the gun in [Petitioner]'s hand. Taina also observed [Petitioner]'s tattoos over his eyebrows. At trial, Taina positively identified [Petitioner] as the gunman.

J.A. testified he was a member of TCB with his brother, Gilbert, and Martin Ramirez. At the time of the April 1999, incident, the Norteno TCBs were having problems with the rival Surenos and Bulldogs. The problems involved verbal altercations, "just like talking trash to each other," and fights. J.A.'s friend, Richard Cruz, told J.A. that he had a problem with [Petitioner], who was with the Bulldogs.

J.A. testified he was in Michelle R.'s front yard with Augie Perez and Eduardo R. when [Petitioner] and four or five members of the Bulldogs arrived on Illinois Street. Martin Ramirez was at Taina's house but ran over to help them. [Petitioner] asked J.A. about his gang affiliation, and J.A. replied he was with TCB. [Petitioner] turned to one of his younger associates and said, "'Handle him, dog.'" J.A. described this person as a "kid" who was known as "Puppet." Puppet produced a gun but seemed too scared to shoot and just stood there. [Petitioner] said, "'Let me see the gun'" and took it from Puppet and fired once or twice at J.A. and his associates.[2]

Fresno Police Officer Alfred Avila responded to Michelle R.'s residence and found a single spent .25-caliber shell casing in the middle of Illinois Street. Officer Avila interviewed Michelle R. about the shooting. Michelle identified the gunman as "Stump," a Hispanic male she had seen in the neighborhood, and she described his distinctive tattoos. Michelle stated Martin Ramirez had been standing next to her when Stump appeared with the gun. Stump yelled, "Why are you boxing with my homeboy" and fired one shot. Martin fell down and held the right side of his ribs, then got up and chased Stump. Several people who had been in her house joined the chase, and they were carrying baseball bats and sticks. Michelle described [Petitioner]'s weapon as a small handgun. Michelle stated the shooting was related to a gang fight which had occurred earlier in the day.

Officer David Surabian interviewed Eduardo R., who stated that "Stump" had been standing in the middle of the street when he fired one shot at the group outside his house. Eduardo believed the weapon was a small black revolver, and stated that Martin Ramirez fell to the ground and said he was shot.

Around 10:30 p.m. on April 18, Officer Robert Lincoln received a dispatch about a fight and responded to a residence on East Illinois, which was the home of Freddie M.'s aunt. Officer Lincoln contacted two juveniles who identified themselves as Freddie M. and Michael C. Michael stated they had been jumped and beaten by some subjects who lived down the street. Michael and Freddie specifically pointed out Michelle R.'s house on East Illinois as the location of the fight. Michael stated the group asked them about their gang affiliation and commented on the color of their clothing, then jumped them.

Officer Lincoln drove to Michelle R.'s house and spoke to the two sisters and their older brother. They informed Officer Lincoln about the shooting which occurred earlier that evening. Lincoln didn't know about the shooting and contacted the police department to learn the details. Officer Lincoln then spoke with Michelle R.'s family and learned the two sisters "were kind of playing both sides of the fence, so to speak, as far as these two rival street gangs." The girls were hanging out with both the Bulldogs and the TCBs. Their older brother tried to supervise them but he didn't have a lot of control over their behavior. Officer Lincoln contacted their mother by telephone and explained the situation to her, "but she didn't realize

---

[2] J.A. was impeached with his convictions for automobile theft in 1997 and 2000.

the magnitude of what was going on." Their mother was upset about the shooting but explained she worked at night and had a hard time with childcare. Officer Lincoln warned her about the situation because the sisters could end up victims on the street.

Officer Lincoln returned to the other house and again spoke with Freddie and Michael, and confronted them with the details about the shooting. Freddie and Michael admitted they failed to mention the shooting, and stated they saw a person known as "Stumpy" pull out a gun and shoot at another individual associated with Michelle R.'s house. Freddie and Michael described Stumpy's distinctive tattoos on his face and neck. They were surprised when Stumpy pulled the gun and fired, and they split up and ran away. Freddie and Michael admitted they were affiliated with the Fresno Bulldogs.

Officer Lincoln testified Michael also described another altercation which occurred that day, prior to the shooting. Michael and his girlfriend were walking in the neighborhood when they were confronted by a group of males. The men asked whether Michael was in the Bulldogs and he admitted it. Michael stated they jumped him and roughed him up. He and his girlfriend ran to the girlfriend's house. Michael left her there and ran into Freddie and Stumpy. Michael stated that he joined Freddie and Stumpy as they walked to a house on Illinois, where a group of males was standing in the front. There was an exchange of "gang-type dialogue" between them. Stumpy pulled a small, chrome semi-automatic pistol from his waistband and fired one shot at the group.

At trial, Michael C. testified he spent April 18, 1999, with his friend, Freddie M. Freddie was staying with his aunt, who lived a few blocks away from Michelle R. Freddie was also known as "Puppet," and was a member of the Bulldogs. Michael testified he was not in a gang but he associated with Bulldog members, and he used to be known as "Psycho." Earlier in the day, Michael's girlfriend was attacked by another girl, who ran up behind her and pulled her hair. Michael was jumped by the girl's friends, who displayed TCB colors.

Michael testified that later in the day, he was walking through the neighborhood when he encountered Freddie with another person, known as "Stump," who had distinctive tattoos on his neck. A tall, skinny man was also with him. Michael testified he joined the three people as they walked to Illinois Street. They stood in the middle of the road and Freddie shouted "Eastside Fresno Bulldogs" at the group of people who were outside Michelle R.'s house. The people standing outside of the house cursed Michael and his associates. Michael testified Stump reached into his jacket and pulled out a small handgun, possibly a .22-caliber. Stump aimed at the group across the street and fired the weapon once or twice. Michael testified that everyone ran after the shooting, and they were chased by people with baseball bats and sticks. Michael never saw Freddie or the other person hand the gun to Stump before he fired.

Michael admitted that he told Freddie about the earlier incident between his girlfriend and another girl, but denied that he participated in the shooting in retaliation for the attack on his girlfriend.

At trial, Michael admitted that when he was initially questioned by the police, he gave a false last name, claimed the group outside the house had thrown beer bottles at his friends, and failed to mention anything about the shooting. Michael was unwilling to identify [Petitioner] as Stump, but admitted [Petitioner]'s tattoos were very similar to those on Stump's neck.

Freddie M. testified he was known as "Puppet" and was a member of the East Side Fresno Bulldogs. Freddie identified [Petitioner] as "Stump." Freddie lived with his aunt on Illinois Street. Freddie testified he was present when shots were fired on Illinois Street in April 1999. Freddie, Michael C., and [Petitioner] stood in the middle of Illinois Street, across

the street from a house where there were several TCB members. The Bulldogs were not getting along with the TCBs at the time. Freddie testified [Petitioner] produced a small handgun and fired twice. He denied handing the gun to [Petitioner]. Freddie denied exchanging any words with the TCBs before the shooting, and claimed he didn't know why [Petitioner] fired or where he aimed. Freddie admitted they failed to mention the shooting and gave a different story when they initially spoke to a police officer that night.

Detective Albert Murrietta interviewed Martin Ramirez about the April 1999, shooting. Martin stated he was visiting his girlfriend when he noticed his friends were having some trouble at Michelle R.'s house. Martin stated he ran over there and saw [Petitioner] and two other associates standing in the street. [Petitioner] produced a gun from his pants pocket, pointed at Martin, and fired the weapon one time. [Petitioner] and his associates ran away. Detective Murrietta also interviewed Martin's girlfriend, Taina, who stated that one of [Petitioner]'s associates produced the gun and handed it to [Petitioner]. Taina further stated that [Petitioner] and his associates ran past her house after the shooting, and [Petitioner] was holding a small silver handgun. Taina stated Martin had been afraid to speak to the police after the shooting. Murrietta testified that both Martin and Taina were sure [Petitioner] had fired the weapon.

Detective Danny Martin separately interviewed Michelle R. and Michael C., and showed them a photograph of [Petitioner]. They identified [Petitioner] as the person known as Stump, and stated [Petitioner] fired at Martin Ramirez.

Detective Martin also interviewed J.A., who identified [Petitioner]'s photograph as Stump. J.A. stated there were problems between the Bulldogs and TCBs, and there had been some fist fights between the two gangs. J.A. identified Stump, "Puppet," and an unknown male as the three people who stood in front of Michelle R.'s house. J.A. stated Stump asked him, "'What do you bang?'" J.A. replied he was with TCBs, and Stump turned to Puppet and said, "'Handle them, Dogs.'" Puppet produced a handgun but didn't shoot it, and Stump took it from him and fired at Martin Ramirez.

**Counts I and II - May 2, 1999**

Gilbert Arteaga (J.A.'s brother) and Richard Cruz were friends and lived near each other in the Illinois Street neighborhood. Gilbert was a member of the Norteno TCBs. Richard was not in the gang but associated with TCB members. On the evening of May 1, 1999, Gilbert and Richard used J.A.'s red bicycle and went to the house of Gilbert's girlfriend, who lived two miles away from their neighborhood. Richard rode the bicycle and Gilbert sat on the handlebars. Around 12:30 a.m. or 1:00 a.m. on May 2, Gilbert and Richard left the girl's house and headed back to their neighborhood. Richard again rode the bicycle and Gilbert sat on the handlebars. Neither Richard nor Gilbert were armed with any type of weapon.

Gilbert testified they were riding on Seventh Street, approaching the intersection at Illinois, when he saw five guys standing on the corner. There was another group of six or seven guys standing on the opposite corner. Both groups were wearing red and one person was wearing a Bulldog shirt. Gilbert believed the two groups were together and consisted of the rival Bulldogs. Gilbert was wearing a red shirt because TCBs also claimed that color, but he was afraid something was about to happen.

Gilbert testified he rode through the intersection with Richard, between the two groups. [Petitioner] was standing with the Bulldogs and shouted, "'There goes the TCBs, Dogs'" and "'Get 'em.'" Gilbert recognized [Petitioner] from the neighborhood, and knew him as Stump. Gilbert also knew [Petitioner] was a Bulldog and had an "MSD" tattoo for the McKenzie Street Dogs. [Petitioner] was dressed in a white shirt and white shorts. Gilbert

testified the two groups rushed toward the bicycle and knocked them down. Five or six of the Bulldogs beat up Gilbert and Richard in the street and the front yard of a house on Illinois.

Gilbert testified that during the fight, [Petitioner] produced a small, sawed off shotgun from his pants, pointed it at him, and fired. Gilbert was sure that [Petitioner] fired the shotgun at him. [Petitioner] was about eight to ten feet away from Gilbert when he fired. Gilbert testified he was shot once in the face, near his right eye. Gilbert tried to stop the bleeding with his clothes. Gilbert started to run away but looked back and saw Richard was still being beaten. Gilbert testified that [Petitioner] ran toward the area where the others were beating Richard. Gilbert again looked back and saw Richard running on Seventh Street, toward the alley between Nevada and Illinois. Gilbert kept running and headed for his house, but he heard two more gunshots as he fled the scene.[3]

Freddie M. testified he was riding his bicycle that night when he went by a house on Illinois where [Petitioner] and six other Bulldogs were drinking beer. Freddie testified that he observed two TCBs riding a bicycle in front of the house. One boy seemed to be giving a ride to the other boy. Freddie admitted he recognized the TCBs as Richard Cruz and Gilbert Arteaga.

Freddie testified he did not hear any verbal exchanges between the Bulldogs and the TCBs. Freddie testified that one of the Bulldogs pulled the boys off the bicycle and a fistfight started between the six Bulldogs and the two TCBs. As the fight continued, Freddie observed [Petitioner] produce a shotgun and fire at Richard Cruz and Gilbert Arteaga. [Petitioner] shot one boy in the eye and the other in the head. Freddie immediately fled the scene.

Freddie felt like "shit" to testify in [Petitioner]'s trial, and had lied when he gave statements to the investigators. Freddie was in custody at juvenile hall and had been convicted of burglary.

In the meantime, Gilbert's family was worried because it was very late and he wasn't home yet. Around 1:00 a.m. on May 2, 1999, Gilbert staggered into his home on East Grant, covering his right eye with his hand. Gilbert had been shot in the face and his eye was full of blood. Gilbert told his mother, "Look what they did to me." Gilbert's brother, Esteban, tried to keep Gilbert conscious so he wouldn't die, and asked him what happened. Gilbert wasn't able to talk very much and it was hard to understand what he was saying. Esteban testified Gilbert "was trying to say something to me like 'Tom' or - or 'Stom' or 'Tom', but I didn't understand what he was trying to say." Gilbert testified his brother, J.A., asked who shot him, and Gilbert replied "'Stump did.'"

Officer Edward Osuna arrived at the Arteaga residence while Gilbert was being treated by the paramedics. Gilbert's face and upper body were covered in blood, and his right eye was swollen. Officer Osuna testified that as Gilbert was being treated, he said: "'They shot me in my right eye.'" The officers recovered the red shirt Gilbert had been wearing. The paramedics treated Gilbert and transported him to the hospital, where the shotgun pellets were removed from his head. Gilbert lost his right eye and had to wear a glass eye, and also lost the feeling on one side of his face.

Officer Donna Valentino interviewed Esteban Arteaga, who stated the family tried to comfort Gilbert until the paramedics arrived and Gilbert had been unable to speak. Estaban didn't say that Gilbert identified the gunman.

Officer Michael Maciel accompanied Gilbert to the hospital and spoke with him in

---

[3]Gilbert was impeached with his prior conviction for auto theft.

the emergency room. Gilbert stated he was returning from his girlfriend's house with his friend when the Bulldogs jumped them on the bicycle. Gilbert stated one of the Bulldogs said, "'What's up, Dog,'" and "'Are you TCB?'" Gilbert heard a loud bang when he was shot. Gilbert gave a brief description of one of the Bulldogs as a Hispanic male in a red shirt and baggy pants, but didn't give the name of the gunman. Officer Maciel testified the medical personnel continued to work on Gilbert and he became dreary and tired, and he ended the interview.

Later that morning, Richard Cruz's family contacted the Arteagas and asked if Richard was there. The Arteagas became concerned because Richard had been with Gilbert that night. Esteban went outside and discovered Gilbert left a trail of blood which led into the street. Esteban and his father followed the blood trail to an alley near Seventh and Illinois Streets, where they found Richard Cruz's body.

Esteban and his father immediately contacted Richard's grandfather and drove him to the alley. As they were driving back to the alley, Mr. Arteaga and Mr. Cruz noticed a young man riding a small red bicycle on the street. Mr. Arteaga and Mr. Cruz both recognized it as the bicycle which Gilbert and Richard used that night. At trial, Mr. Arteaga testified the bicyclist turned onto another street and he was unable to see his face. However, Mr. Cruz testified that he kept watching the bicyclist and recognized him as "Stump." Mr. Cruz testified that Mr. Arteaga also recognized Stump because they looked at each other and commented that Stump was on the bicycle.

Mr. Arteaga drove to the alley and Mr. Cruz turned over the body, and immediately realized his grandson was dead. Mr. Cruz stayed with the body until the police arrived. Mr. Arteaga testified he returned to his vehicle and drove around the neighborhood, but he never saw the bicyclist again and Gilbert's bicycle was never recovered.

At trial, Mr. Cruz identified [Petitioner] as the person riding Gilbert's bicycle, and testified he had known "Stump" since he was a child. Mr. Cruz testified [Petitioner]'s mother used to be friends with Richard's mother, and the two families lived together for a brief time. They were no longer friends at the time of the shooting. Mr. Cruz admitted he didn't tell the officers about Stump that night, but testified that he was "out of it" once he found his grandson's body. "I was off. I lost it, you know, seeing my grandson dead there." Officer Conrad Clay confirmed Mr. Cruz was very emotional when the police responded to the alley. Mr. Cruz cradled his grandson's body in the arms and was very angry.

The police found four spent Remington 12-gauge shotgun shells near the corner of Seventh and Illinois. There were three shotgun waddings about 10 to 15 feet away from the spent shells. There were no shell casings or waddings in the alley.

Richard had suffered three shotgun wounds in the back, which spread pellets throughout his body. There were no exit wounds. The first shot was to the left back side of the chest, and approximately 90 pellets spread through his chest and penetrated his liver, left kidney, left lung, and left ventricle of the heart. The pellets were lodged in the lung and heart. These wounds resulted in extensive internal bleeding in the chest cavity, and were the fatal wounds. The second shot was to the right rear side of the chest, and the pellets spread throughout Richard's right side, including his right arm, right side of his head, right ear, and right eye. The third shot was to the back of Richard's lower legs, and the pellets spread through an 11 inch area. None of the wounds left any blackening or tattooing on Richard's body, which indicated the weapon was not fired at close range.

Detective Danny Martin testified that based on his review of the scene and the physical evidence, Richard Cruz was shot in the street and managed to make it into the alley, where he collapsed and died. Based on the location of the pellet wounds, it appeared Richard

was looking back over his right shoulder when he was hit by the second gunshot. There were also abrasions and injuries on Richard's face and arms, consistent with falling on a hard surface.

**Additional Trial Testimony**

At trial, Gilbert positively identified [Petitioner] as the person who shot him in the face. Gilbert knew about the shooting in April 1999, at Michelle R.'s house, where he hung out with his friends, but he was not present when Martin Ramirez was shot. Gilbert also knew that [Petitioner] and Richard Cruz had problems and used to fight. Gilbert knew that Richard beat [Petitioner] every time they fought, and Richard wasn't afraid of [Petitioner].

Detective Danny Martin tried to interview Gilbert three times while he was in the hospital, but Gilbert was still being treated and on medication. In one hospital interview, Gilbert stated he was with Richard on the bicycle when they were jumped by several males, who yelled "'What's up, Dogs?'" Gilbert further stated that they were fighting and he heard several gunshots and felt the pain. Gilbert ran home and didn't see what happened to Richard. Gilbert had not yet been told that Richard was dead.

Detective Martin finally conducted a complete interview with Gilbert after he went home from the hospital. Gilbert was much more awake and alert than when Martin spoke with him in the hospital. Gilbert again stated he was with Richard on the bicycle when they were jumped by two groups of individuals on Seventh and Illinois. Gilbert stated Stump was in one of the groups, and shouted at them. Gilbert stated Stump grabbed Richard and knocked them off the bicycle, and Stump's group started to beat them. Gilbert and Richard tried to avoid the beating, and Gilbert saw Stump pull a pump-action shotgun from his pants. Gilbert stated Stump shot him and he immediately fell down. Gilbert stated the rest of the group followed Richard, who ran down the street. Gilbert ran away and headed for his house, and saw Richard turn into the alley. Gilbert heard two more shots fired as he ran. Gilbert identified [Petitioner]'s photograph as Stump. Gilbert stated he didn't see Richard being shot. Detective Martin testified Gilbert never said that he actually saw Richard being shot.

Detective Martin interviewed Freddie M., and determined he was known as Puppet. Freddie stated he was riding his bicycle when he observed Stump and his associates beating two TCBs, and he recognized them as Richard and Gilbert. Freddie stated Stump told the Bulldogs to let the TCBs go. Stump then pulled a shotgun out of his pants and fired it twice at one boy, who was hit in the head. Freddie thought the other boy ran into the alley. Freddie heard two more shots but did not see who fired the additional shots or who was injured.

Officer Johnny Soto interviewed Mr. Arteaga, Gilbert's father, at the hospital. Mr. Arteaga stated that he saw someone riding Gilbert's bicycle but he couldn't see that person's face. Officer Soto returned to the scene and looked for the bicycle. He was approached by Salvador Muratella, who asked the officer to call him later. During a subsequent telephone conversation, Muratella stated that a Hispanic male had been walking around the neighborhood with a shotgun the previous night. Muratella stated he could identify the individual but he was afraid.

Detective Martin subsequently interviewed Muratella, who stated he was staying with some friends in the area when Stump arrived at the house with some associates. Stump displayed two guns, and stated the police were looking for him because he had shot someone a few days earlier. Stump and his friends left the house, and Stump said, "'Let's go jack some fools.'" Muratella stated he heard gunshots about 20 minutes later. Muratella identified [Petitioner] from a photograph as Stump.

Detective Martin interviewed Gloria Gonzales, the person with whom Muratella had

been staying. She lived at Eighth and Illinois, and stated Stump arrived at her house the night before the shooting and displayed a sawed-off shotgun. Gonzales stated Stump was very proud about the weapon, but Gonzales told him to immediately leave the house. Gonzales identified [Petitioner]'s photograph as Stump.

Detective Martin also interviewed Georgina R., Gonzales's daughter, when she was in custody in juvenile hall. She identified [Petitioner]'s photograph as Stump, and confirmed that Stump visited her house the night before the shooting and displayed a sawed-off shotgun and a small revolver. Her mother became upset and told him to leave. Georgina further stated that Stump and his friends returned to her house around 1:00 a.m. or 2:00 a.m. that morning. They didn't stay long and seemed to be drunk. Georgina stated she heard four gunshots a few minutes after [Petitioner] and his friends left. Georgina saw Stump a few days later and asked if he did the shootings. Georgina stated that Stump said yes, "that he had shot one of them in the face and that he had killed the other one, his cousin." Georgina asked why, and Stump replied "he had to shoot his cousin [Richard Cruz] because he wouldn't learn. He continued by saying that he had 'punked' [beaten] him but he wouldn't learn." Georgina stated Stump had beaten Richard on prior occasions. Stump further stated "his cousin wouldn't leave him alone and was always talking TCB stuff."

At trial, Salvador Muratella testified he was staying with Gloria Gonzales and her daughter, Georgina R., at their house on East Illinois, on May 1, 1999. Around 9:30 p.m. or 10:00 p.m., [Petitioner] arrived with a group of friends. [Petitioner] showed everyone that he was carrying two weapons: a small handgun, which he produced from his pocket, and a 19-inch shotgun, which he partially raised from his waistband. The shotgun barrel was hidden by [Petitioner]'s pants. Muratella testified [Petitioner] and his friends left the house, and [Petitioner] said "he was gonna go jack some fools" which, according to Muratella, meant he was going to commit a robbery. Muratella testified he heard four or five gunshots about 35 to 45 minutes after [Petitioner] and his friends left the house.[4]

Gloria Gonzales testified [Petitioner] was at her house on the evening of May 1, 1999, the night before Richard Cruz was killed. Gonzales testified [Petitioner] showed her the handle of a long gun or rifle, and Gonzales told [Petitioner] to leave because it was late and she had been asleep.

Georgina R. admitted she knew [Petitioner] as "Stump," and she was afraid to testify because of [Petitioner]'s family. Georgina also admitted [Petitioner] visited her house the day before Richard Cruz was killed. [Petitioner] stayed for about 10 minutes until Georgina's mother became angry at him and made him leave. Georgina did not know why her mother was angry at [Petitioner].

Georgina either denied or couldn't remember that she spoke with the police in June 1999, about Richard's death, when she was in juvenile hall. She heard rumors that [Petitioner] admitted he killed one guy and shot another in the face. She also admitted she had a dog paw tattoo behind her right ear for the Bulldogs, but claimed she was no longer a gang member. Georgina claimed she lost most of her memory because she suffered head injuries in a car accident in October 1999.

On May 4, 1999, [Petitioner] surrendered to the police and was arrested for both shooting incidents.

---

[4]Muratella was impeached with his prior convictions for forgery and possession for sale of cocaine and methamphetamine. Muratella was in custody, and admitted he was afraid to testify.

**Gang Expert Testimony**

Officer Michelle Ochoa testified as the prosecution's expert on criminal street gangs. There were approximately 5,000 members of the Fresno Bulldogs and related neighborhood gangs, which were based on geographic areas of the city. The McKenzie Street Dogs were related to the East Side Fresno Bulldogs. [Petitioner] was considered a hard core member of the Bulldogs. The Chicale Boys (TCBs) were a much smaller gang and rivals of the Bulldogs. Gilbert Arteaga claimed affiliation with TCB. Martin Ramirez was not a member of TCB but associated with them. Officer Ochoa testified that based on the circumstances, [Petitioner] shot Richard and Gilbert for the benefit of the East Side Fresno Bulldogs.

**Defense Evidence**

[Petitioner] did not testify at trial. Maria H., [Petitioner]'s former girlfriend, testified they lived together on Bond Street in May 1999. Maria testified [Petitioner] spent the evening of May 1, 1999, at their apartment. They watched "Mad T.V." on Channel 26, which started at 11:00 p.m. and lasted one hour. Sometime around midnight, their neighbors, Greg and Teddy Null, came to their apartment and asked for some cigarettes. [Petitioner] went outside and smoked with them, and Maria could hear [Petitioner]'s voice. Maria received a telephone call around 2:00 a.m., at which time [Petitioner] returned to the apartment and they went to bed. Maria testified [Petitioner] left the apartment some time after 9:00 a.m. the next morning. Maria admitted she had never given this information to the police or the district attorney's office. She only talked to [Petitioner]'s first defense attorney, Franz Criego, and later spoke to the defense investigator.

Brenda Null testified that in May 1999, she lived with her sons in the same apartment complex as [Petitioner] and Maria H. Brenda testified that around midnight on May 1, 1999, she sent her sons to [Petitioner]'s apartment to get a cigarette from him. The boys returned with the cigarette then stayed outside with [Petitioner] until around 2:00 a.m. Teddy and Greg Null also testified they were smoking cigarettes with [Petitioner] on the night that he was supposed to have shot Gilbert and Richard. [Petitioner] returned to his apartment around 2:00 a.m.

Franz Criego, a deputy public defender, testified he was initially appointed to represent [Petitioner] in May 1999. In the course of his investigation, Criego interviewed Maria H., who stated [Petitioner] had spent the evening smoking cigarettes with their neighbors. Criego testified he also interviewed the neighbors. Criego's office subsequently declared a conflict and he withdrew from the case. He turned over his file to the court but purged his notes as confidential work product, and he did not have any notes about his conversations with Maria and her neighbors.

John Donnelly, a psychiatrist at University Medical Center, examined Gilbert Arteaga while he was hospitalized to determine the impact of his head wounds. Donnelly testified Gilbert had lost his right eye and underwent a craniotomy to remove pressure from his brain. Donnelly determined Gilbert's short-term memory was intact and he was fully oriented. Donnelly asked Gilbert about the shooting, and Gilbert stated he was shot when he rode home on his bicycle from his girlfriend's house. Gilbert suspected the shooting was the result of gang retaliation, and stated the gang members "jumped and beat him and some of his friends." Gilbert had just learned about Richard's death when Donnelly examined him.

J.A. testified about the night when Gilbert staggered home with the gunshot wound to his head. J.A. testified that he asked Gilbert, "'Was it Stump,'" and Gilbert said yes.

Francisco M. testified [Petitioner] was his friend, and occasionally lived at his house. He also knew Gilbert Arteaga, and that Gilbert claimed [Petitioner] shot him. In November

1999, Francisco was with his friends, Joseph C. and Israel R., as they were riding their bicycles on Sixth and Illinois. Francisco fell off his bike and his friends stopped and laughed at him. While he was getting up, Gilbert Arteaga appeared on the street and yelled, "'Fuck Bullfrogs,'" meant as an insult to the Bulldogs, and "'TCB Westside.'" Gilbert was with four or five associates, who tried to chase Francisco and his friends. Gilbert and his associates caught up with them, and Gilbert told Francisco, "'You guys are the ones that shot me.'" Francisco and his friends denied it, and Gilbert replied: "'Well, I didn't know who shot me. It was somebody from Illinois Street Dogs.'" Gilbert let them leave. Francisco testified he told [Petitioner] about Gilbert's statements, but admitted he never told the police department. [Petitioner]'s wife helped Francisco contact [Petitioner]'s attorney.

Joseph C. testified he was with Francisco when Gilbert Arteaga accused them of shooting him. However, Joseph believed the incident occurred in the summer of 1999. Joseph never told the police about Gilbert's statement. Joseph testified that he frequently saw [Petitioner] at Francisco's house, and [Petitioner] was his friend. [Petitioner] had called Joseph from jail and encouraged him to testify in the case.

Myrl Stebens, the defense investigator, testified he interviewed Freddie M. in juvenile hall in November 2000, and Freddie stated he was not present when Gilbert Arteaga and Richard Cruz were shot. Freddie said he repeatedly told Detective Martin he was not there, but Martin threatened to charge him with Richard's murder. Freddie claimed he fabricated his statement to the police as a result of the threats, and his story about the shooting was based on rumors he heard in the street.

Stebens testified he interviewed Salvador Muratella in jail. Muratella stated that he saw [Petitioner] on the evening of May 1, 1999, and [Petitioner] displayed a shotgun. Muratella stated that after [Petitioner] left, he heard two loud shots in the neighborhood, followed by three shots from a smaller caliber weapon.

James Hernandez, a professor of criminal justice, testified as a defense expert on gangs. Hernandez conceded the shootings of Richard Cruz and Gilbert Arteaga ostensibly appeared to be gang-related. However, Hernandez testified it was not unusual for gang members to testify against other gang members to obtain benefits for themselves from law enforcement officers. Hernandez was particularly concerned about Freddie M.'s testimony, because Freddie was a Bulldog and it was very unusual for a gang member to testify against a member of the same gang. However, members of the same gang could testify against each other to eliminate rivals from that gang and minimize their own involvement in the crime. Hernandez believed that if [Petitioner] was the gunman, the shooting of Richard Cruz was more of a personal matter between [Petitioner] and his relative, Richard, than a gang-related incident.

Mark Coleman, an attorney, testified he was an expert in ballistics and shotgun scatter patterns, but conceded he had never testified as an expert witness in a trial. Coleman testified Gilbert Arteaga was shot with different types of pellets than those which were removed from Richard Cruz's body, and they might have been fired from different weapons.

Cecil Collier testified he was housed next to Gilbert Arteaga in the Fresno County Jail in November 2000. Collier knew Gilbert was a Norteno TCB. Collier overheard Gilbert speaking to a group of Surenos in jail about how he lost his eye. Gilbert stated he had been cruising around with his homeboy when they stopped to talk to some girls. The Bulldogs became upset because the girls went with Gilbert and his homeboy, and a fight started. Gilbert stated someone yelled gun, and his homeboy was shot with a shotgun. As he went to help his homeboy, Gilbert was also shot with the shotgun. According to Collier, Gilbert stated he didn't know who shot him. Collier later told Gilbert that he shouldn't be speaking with the Surenos about the shooting.

1

2          Collier testified Gilbert talked about this case with him. Gilbert stated a police
       detective showed him a photograph and asked if this was the person who shot him. Gilbert
       said no, but the detective insisted this was the person who shot him. Gilbert alternatively
3      stated he was going to testify that Stump did or did not shoot him. Gilbert further stated the
       detective was going to help him get into school when he was released from jail.

4          [Petitioner] was acquitted of the murder of Richard Cruz. As for Gilbert Arteaga,
       [Petitioner] was found not guilty of attempted murder, but guilty of the lesser related offense
5      of attempted voluntary manslaughter. [Petitioner] was convicted of assault with a firearm on
       Martin Ramirez. The personal use, great bodily injury, and gang enhancements were found
6      true.

7      See Exhibit A at pp. 3-23, Respondent's Answer.

8                                    **DISCUSSION**

9      **I.  Jurisdiction**

10         Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

11     to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

12     the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

13     375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

14     Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court,

15     which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly,

16     the Court has jurisdiction over the action.

17         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

18     1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

19     Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

20     F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

21     *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

22     (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

23     filed after the enactment of the AEDPA; thus, it is governed by its provisions.

24     **II.  Legal Standard of Review**

25         This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

26     pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

27     Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

28         The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

1   Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

2   (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

3   adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

4   application of, clearly established Federal law, as determined by the Supreme Court of the United

5   States" or "resulted in a decision that was based on an unreasonable determination of the facts in

6   light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

7   538 U.S. at 70-71; see Williams, 529 U.S. at 413.

8        As a threshold matter, this Court must "first decide what constitutes 'clearly established

9   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

10  quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

11  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

12  of the relevant state-court decision." Id., quoting Williams, 592 U.S. at 412. "In other words, 'clearly

13  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

14  the Supreme Court at the time the state court renders its decision." Id.

15       Finally, this Court must consider whether the state court's decision was "contrary to, or

16  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

17  quoting 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

18  writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

19  question of law or if the state court decides a case differently than [the] Court has on a set of

20  materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

21  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

22  court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

23  applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

24       "[A] federal court may not issue the writ simply because the court concludes in its

25  independent judgment that the relevant state court decision applied clearly established federal law

26  erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

27  federal habeas court making the "unreasonable application" inquiry should ask whether the state

28  court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

1   Petitioner has the burden of establishing that the decision of the state court is contrary to or

2   involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>,

3   94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

4   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

5   decision is objectively unreasonable.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th

6   Cir.1999).

7   AEDPA requires that we give considerable deference to state court decisions. The state

8   court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

9   interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537

10   U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

11   **III.  Review of Petitioner's Claims**

12   **A. Ground One**

13   In his first claim for relief, Petitioner alleges his motion to sever the two counts was wrongly

14   denied in violation of his due process rights as guaranteed by the Fifth and Fourteenth Amendments

15   to the United States Constitution. He argues the joinder of the two separate indictments deprived him

16   of a fair trial because evidence was introduced that was not cross-admissible and the prosecutor

17   repeatedly urged the jury to consider the similarity of the crimes.

18   This claim was first presented on direct appeal to the Fifth DCA.  On January 22, 2003, the

19   Fifth DCA denied the claim in a reasoned opinion. <u>See</u> Exhibit A, Respondent's Answer. Petitioner

20   then presented the claim in a petition for review in the California Supreme Court where it was

21   summarily denied. <u>See</u> Exhibits A and B, Petitioner's Amended Petition.  The California Supreme

22   Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied

23   the claims presented for the same reasons stated in the opinion of the Fifth DCA.  <u>Ylst v.</u>

24   <u>Nunnemaker</u>, 501 U.S. 797, 803 (1991).

25   The Fifth DCA analyzed the claim as follows:

26   The law prefers consolidation of charges. (*People v. Ochoa* (1998) 19 Cal.4th 353,
     409.) Joinder of criminal charges for trial benefits the public by reducing delay in the
27   disposition of criminal charges, and it benefits the state by conserving judicial resources and
     public funds. *(People v. Bean* (1988) 46 Cal.3d 919, 939-940; see also *People v. Mason*
28   (1991) 52 Cal.3d 909, 935.) "Whenever a defendant is tried for multiple crimes of the same

class, the jury will be presented with evidence that the defendant committed multiple offenses. This necessary concomitant of joinder is not sufficient to render the joinder unduly prejudicial. If it were, joinder could never be permitted. The danger to be avoided in joinder of offenses is that strong evidence of a lesser but inflammatory crime might be used to bolster a weak case on another crime." (*People v. Hill* (1995) 34 Cal.App.4th 727, 735-736.)

Where the offenses charged are of the same class, joinder is proper under section 954. (*People v. Kraft* (2000) 23 Cal.4th 978, 1030.) Section 954 states that "[a]n accusatory pleading may charge ... two or more different offenses of the same class of crimes or offenses, under separate counts, ... provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately ...."

"For purposes of joinder, offenses are deemed to have been connected together in their commission, where there exists 'a common element of substantial importance in their commission,' even though the offenses charged do not relate to the same transaction and were committed at different times and places against different victims. [Citations.] Offenses are of the ""same class"" if they possess 'common characteristics or attributes.' [Citation.]" (*People v. Poon* (1981) 125 Cal.App.3d 55, 68, disapproved on other grounds in *People v. Lopez* (1998) 19 Cal.4th 282, 292; see also *People v. Alvarez* (1996) 14 Cal.4th 155, 188; *People v. Leney* (1989) 213 Cal.App.3d 265, 269; *People v. Windham* (1987) 194 Cal.App.3d 1580, 1591.)

"[S]ection 954 permits joinder of all assaultive crimes against the person, all of them being considered 'of the same class.'" (*Coleman v. Superior Court* (1981) 116 CaI.App.3d 129, 135.) There is no question that murder, attempted murder, and assault with a firearm, as charged in this case, are assaultive crimes against the person and are offenses of the same class. (*People v. Walker* (1988) 47 Cal.3d 605, 622; *People v. Stewart* (1985) 165 Cal.App.3d 1050, 1058; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1243; *People v. Hill, supra*, 34 Cal.App.4th at p. 734.) The trial court properly granted the prosecution's motion in the instant case to consolidate counts I and II with count III.

This conclusion does not end the analysis. Even where joinder is statutorily authorized, severance may be constitutionally required if joinder of the offenses would be so prejudicial that it would deny a defendant a fair trial. (*People v. Musselwhite, supra*, 17 Cal.4th at pp. 1243-1244; *Williams v. Superior Court* (1984) 36 Cal.3d 441, 447.) We review the denial of defendant's motion for an abuse of discretion, that is, whether the denial fell "'outside the bounds of reason.'" (*People v. Ochoa, supra*, 19 Cal.4th at p. 408, quoting *People v. DeSantis* (1992) 2 Cal.4th 1198, 1226.)

This court examines a pretrial severance ruling on the record before the court at the time of the motion. (*People v. Arias* (1996) 13 Cal.4th 92, 127.) However, even if the trial court's ruling is correct at the time when made, this court must reverse the judgment if the defendant shows failure to sever actually resulted in a ""'gross unfairness'"" amounting to a denial of due process under federal law. (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.)

In *Williams v. Superior Court, supra*, 36 Cal.3d 441, the California Supreme Court stated several factors to be considered in deciding whether charges should be joined: (1) the lack of cross-admissibility of evidence; (2) the prejudicial effect of joining one charge with a more inflammatory charge; (3) the prejudicial effect of joining a weak case with a strong case; and (4) whether the People sought to join a charge with a capital offense. (*Id.* at p. 452.)

Cross-admissibility concerns whether evidence on each of the joined charges would be admissible, under Evidence Code section 1101, in separate trials on the other charges. (*People v. Balderas* (1985) 41 Cal.3d 144, 171-172.) Evidence Code section 1101,

subdivision (b) allows the admission of evidence of the defendants' past conduct, including uncharged crimes, where the evidence is relevant to prove some fact other than the disposition to commit the crime such as, motive, opportunity, intent, preparation, plan, identity or knowledge. (Evid. Code, § 1101, subd. (b).) If the evidence is cross-admissible, then any inference of prejudice is dispelled, and denial of severance is proper. (*People v. Kraft, supra*, 24 Cal.4th at p. 1030.)

Although both parties herein discuss the cross-admissibility of evidence as an additional consideration, section 954.1 expressly permits joinder of offenses even when the evidence is not cross-admissible. (*People v. Hill, supra*, 34 Cal.App.4th at pp. 734735; see also *People v. Catlin* (2001) 26 Cal.4th 81, 111, fn. 3; *People v. Bradford* (1997) 15 Cal.4th 1229, 1314, fn. 13.) Section 954.1, which was enacted with the passage of Proposition 115 in 1990, states that "... evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." Section 954.1 thus expressly permits joinder of offenses even when the evidence is not cross-admissible. (*People v. Hill, supra*, at pp. 734-735; *Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1284.)

[Petitioner] insists the discussion of cross-admissibility in *Williams* was grounded in federal constitutional law and survived the enactment of Proposition 115. [Petitioner]'s interpretation of *Williams* and Proposition 115 confuses prejudice and cross-admissibility:

"While Proposition 115 did not discard all prior case law regarding joinder, it did specifically limit the treatment of cross-admissibility of evidence as a primary factor for determining prejudice as set forth in *Williams*. Under Penal Code section 954.1, enacted as part of Proposition 115, evidence concerning one offense need not be admissible as to the other offense before the two offenses may be tried together. This limitation is a codification of several Supreme Court cases decided after *Williams* that hold that while cross-admissibility may be considered as a factor suggesting possible prejudice, the absence of cross-admissibility does not, by itself, suffice to demonstrate prejudice. [Citations.] Proposition 115 also precludes any possible future judicial construction (unless compelled by the federal Constitution) to the effect that cross-admissibility of evidence is a requisite of joinder (or the denial of a motion for severance)." (*Belton v. Superior Court, supra*, 19 Cal.App.4th at p. 1286.)

While the lack of cross-admissibility no longer is an obstacle to joinder or consolidation, it is still an important consideration because if the evidence is cross-admissible, that dispels any inference of prejudice. (*People v. Bradford, supra*, 15 Cal.4th at pp. 1315-1316.) An absence of cross-admissibility, however, does not in itself demonstrate prejudice. (*People v. Memro* (1995) 11 Cal.4th 786, 850.)

Thus, the sole question upon review of the denial of a motion for severance is whether the prejudice to the defendant from joinder of the cases outweighed the benefits. (*People v. Hill, supra*, 34 Cal.App.4th at p. 735; *Belton v. Superior Court, supra*, 19 Cal.App.4th at p. 1286.) In determining the question of prejudice, evaluation is made in light of the showings made and facts known at the time the motion for severance is made. (*People v. Gomez* (1994) 24 Cal.App.4th 22, 27; *People v. Balderas, supra*, 41 Cal.3d at p. 171.) Defendant has the burden of demonstrating that denial of severance was a prejudicial abuse of discretion. (*People v. Gomez, supra*, at p. 27.) Prejudice must be proved, and "'[a] bald assertion of prejudice is not enough.'" (*Ibid*.)

"The determination of prejudice to the defendant from joinder is necessarily dependent upon the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever. The denial of severance may be an abuse of discretion if: (1) highly inflammatory offenses were joined

1   with noninflammatory crimes; (2) a relatively weak case was joined with a relatively strong
    case so that the aggregate evidence had a spillover effect and altered the outcome on the
2   relatively weak charges; and (3) one of the charges carried the death penalty. [Citations.]"
    (*People v. Hill, supra*, 34 Cal.App.4th at p. 735.)

3
        Given that the death penalty is irrelevant in this case, we note the benefits to the
4   public and state outweighed the prejudice to [Petitioner] from joinder of the counts by
    reducing delay in the disposition of criminal charges and by conserving judicial resources and
5   public funds. (*People v. Mason, supra*, 52 Cal.3d at p. 935.) In examining the relevant
    factors, the trial court did not abuse its discretion in denying [Petitioner]'s severance motion.
6   The danger to be avoided in joinder of offenses is that strong evidence of a lesser but
    inflammatory crime might be used to bolster a weak case in another crime. (*Id*. at p. 934.)
7   That danger was not present here where neither case was significantly stronger or more
    inflammatory than the other. All three charges involved an unprovoked shooting at an
8   unarmed victim in the course of an exchange of verbal insults between members of rival
    gangs. There were numerous eyewitnesses to the April 18, 1999, incident who identified
9   [Petitioner] as the person who stood in the middle of the street and either produced a weapon
    or took it from one of his associates. The witnesses also testified, without contradiction, that
10  [Petitioner] fired at Martin Ramirez, who fell to the ground and narrowly escaped being
    wounded.

11
        As for the May 2, 1999, murder and attempted murder charges, Gilbert Arteaga and
12  Freddie M. testified that [Petitioner] produced a shotgun and fired at Gilbert's head. Neither
    Gilbert nor Freddie saw the fatal shots being fired at Richard Cruz. Gilbert was literally
13  running for his life when he heard additional shots being fired, and Freddie had also left the
    scene when he heard the other shots. While no one saw the gunman who fired the fatal shots,
14  Gilbert and Freddie testified [Petitioner] was the person who was holding the shotgun when
    they fled the area.

15
        As for the gang-related evidence, [Petitioner]'s gang affiliation was going to be
16  obvious to the jury in both cases based on the distinctive Bulldog tattoos on his face, which
    many of the witnesses cited in their description of the gunman in both the April and May
17  1999, offenses. Thus, it cannot be said that the April 1999, assault offense was more
    inflammatory, or based on stronger evidence, than the May 1999, charges, to create a
18  spillover effect from one case to the other. (*Belton v. Superior Court, supra*, 19 Cal.App.4th
    at p. 1287.)

19
        In addition, [Petitioner] has not demonstrated that prejudice actually resulted from the
20  joinder of the charges at trial. (*People v. Memro, supra*, 11 Cal.4th at p. 851; *People v. Hill,
    supra*, 34 Cal.App.4th at p. 735; *People v. Bradford, supra*, 15 Cal.4th at p. 1318.) As
21  pointed out in *People v. Moore* (1986) 185 Cal.App.3d 1005, where the jury acquits as to one
    joined charge and convicts as to the other, there can be no showing of prejudice as to the
22  joinder since the verdicts make clear that the jury "clearly considered and weighed the
    evidence carefully as to each charge separately." (*Id*. at p. 1013; cf. *Walker v. Superior Court*
23  (1974) 37 Cal.App.3d 938, 942, fn. 1.) The jury herein acquitted [Petitioner] of the most
    serious charge of murder, and returned a verdict for attempted voluntary manslaughter as a
24  lesser related offense of attempted murder. "The acquittals demonstrate a careful sifting of
    the evidence and a properly cautious verdict." (*People v. Moore, supra*, at p. 1013.)

25
        On balance, we conclude the statutory requirements of joinder were met, and
26  [Petitioner] has failed to demonstrate undue prejudice resulting from the joinder of the
    charges at trial. Thus, we find no abuse of discretion in the trial court's denial of [Petitioner]'s
27  motion for severance.

28  <u>See</u> Exhibit A at pp. 26-32, Respondent's Answer (footnotes omitted).

1   Initially, the Court notes that Respondent correctly asserts that the claim as presented fails to

2   state a cognizable claim for relief.  The claim is completely conclusory and unsupported by any

3   evidence.  "Conclusory allegations which are not supported by a statement of specific facts do not

4   warrant habeas relief." James v. Borg, 24 F.3d 20, 29 (9th Cir.1994); Jones v. Gomez, 66 F.3d 199,

5   204-05 (9th Cir.1995) (holding that conclusory allegations made with no reference to the record or

6   any document do not merit habeas relief); Allard v. Nelson, 423 F.2d 1216, 1217 (9th Cir.1970)

7   (Conclusory allegations in a habeas petition fail to state a claim and do not suffice to shift the burden

8   to the state to answer an order to show cause.); Campbell v. Wood 18 F.3d 662, 679 (9th Cir.1994),

9   citing Boehme v. Maxwell, 423 F.2d 1056, 1058 (9th Cir.1970) ("An evidentiary hearing is not

10  required on allegations that are "conclusory and wholly devoid of specifics."').

11  Moreover, Rule 4 of the Rules Governing Section 2254 Cases explicitly allows the district

12  court to dismiss summarily a habeas petition when no claim for relief is stated.  See O'Bremski v.

13  Maass, 915 F.2d 418, 420 (9th Cir.1990.)  Notice pleading is insufficient; the petitioner must state

14  sufficient facts.  See id. (citing Blackledge v. Allison, 431 U.S. 63, 75 n.7 (1977). Petitioner should

15  not be given an opportunity to amend his claims to state a cognizable claim since he has already been

16  informed of these deficiencies and granted an opportunity to cure them. His initial petition was

17  dismissed for the very same reasons.

18  Here, Petitioner only claims that certain evidence was cross-admissible thereby resulting in

19  an unfair trial. Unfortunately, he fails to state what evidence elicited on one count was so damaging

20  to his defense on the other count that it deprived him of a fair trial. Petitioner also alleges the

21  prosecutor repeatedly urged the jury to consider the similarity of the crimes. Again, Petitioner fails to

22  support this claim with any specific facts. The Court is left to guess at what evidence Petitioner

23  believes was so prejudicial as to deprive him of a fair trial. Accordingly, the claim should be rejected

24  for failure to state a claim. In any case, there is no merit to his claim.

25  Petitioner contends that misjoinder of the two counts unconstitutionally deprived him of a

26  fair trial. However, improper joinder, in itself, does not violate the Constitution. United States v.

27  Lane, 474 U.S. 438, 446 (1986); see also Kotteakos v. United States, 328 U.S. 750, 774-775 (1946).

28  "Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice

1   so great as to deny a defendant his Fifth Amendment right to a fair trial." <u>Lane</u>, 474 U.S. at 446 fn. 8.

2   In <u>Lane</u>, the Supreme Court held that an "error involving misjoinder 'affects substantial rights' and

3   requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and

4   injurious effect or influence in determining the jury's verdict.'" <u>Id</u>., 474 U.S. at 449, *quoting*

5   <u>Kotteakos</u>, 328 U.S. at 776. In this case, Petitioner has failed to show actual prejudice resulting from

6   joinder of the two counts or the trial court's decision denying the motion to sever.

7          As discussed by the appellate court, there was no danger in this case that strong evidence "of

8   a lesser but inflammatory crime might be used to bolster a weak case in another crime." <u>See</u> Exhibit

9   A at p. 31, Respondent's Answer.  One case was not stronger than the other. In all three cases,

10  several eyewitnesses testified that Petitioner was the perpetrator in each. Also, each charge involved

11  unprovoked shootings at unarmed victims during a confrontation between members of opposing

12  gangs. The evidence of Petitioner's gang membership was obvious to the jury in both cases because

13  of the distinctive Bulldog tattoos on his face. Moreover, Petitioner has failed to demonstrate actual

14  prejudice. The jury acquitted Petitioner of the most serious charge of murder and returned a verdict

15  of guilty of a lesser charge - attempted voluntary manslaughter - as to the second count of attempted

16  murder. This indicates the jury clearly considered and weighed the evidence as to each charge. Thus,

17  Petitioner has failed to demonstrate any prejudice depriving him of a fair trial in violation of the

18  Constitution.

19         Accordingly, the rejection of this claim by the state courts was neither contrary to nor an

20  unreasonable application of clearly established Federal law, nor an unreasonable determination of the

21  facts in light of the evidence presented. <u>See</u> 28 U.S.C. § 2254(d). The claim should be denied.

22         **B. Ground Two**

23         In his second and final claim for relief, Petitioner asserts the prosecutor committed

24  misconduct in violation of his due process rights as guaranteed by the Fifth and Fourteenth

25  Amendments to the United States Constitution. Specifically, he alleges the prosecutor elicited

26  inadmissible evidence, improperly drew attention to Petitioner's failure to testify, and misled the

27  jurors about the duties of a defense attorney.

28         A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the

1    trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v.

2    DeChristoforo, 416 U.S. 637, 643 (1974).   To constitute a due process violation, the prosecutorial

3    misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair

4    trial." Greer v. Miller, 485 U.S. 756, 765 (1987), quoting United States v. Bagley, 473 U.S. 667

5    (1985).  Any claim of prosecutorial misconduct must be reviewed within the context of the entire

6    trial.  Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The court

7    must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial

8    misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due

9    process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair

10   trial to the accused."  Smith v. Phillips, 455 U.S. 209, 219 (1982). "Improper argument does not, per

11   se, violate a defendant's constitutional rights." Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir.

12   1996), quoting Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir.1993). If prosecutorial misconduct is

13   established, and it was constitutional error, the error must be evaluated pursuant to the harmless error

14   test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 ("Only

15   if the argument were constitutional error would we have to decide whether the constitutional error

16   was harmless.").

17         This claim was also first presented and denied on direct appeal to the Fifth DCA. It was then

18   presented in a petition for review before the California Supreme Court where it was summarily

19   denied. The California Supreme Court, by its "silent order" denying review of the Fifth DCA's

20   decision, is presumed to have denied the claims presented for the same reasons stated in the opinion

21   of the Fifth DCA. Ylst, 501 U.S. at 803.

22         *1. Inadmissible Evidence*

23         As with the first claim, Petitioner fails to present a cognizable federal claim here. The claim

24   as stated is completely conclusory and unsupported by any evidence. Petitioner claims the prosecutor

25   elicited inadmissible evidence but he does not identify the suspect evidence. Thus, there is no way to

26   determine whether the alleged misconduct "so infected the trial with unfairness as to make the

27   resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. The claim should be

28   denied.

1    *2. Improper Attention to Failure to Testify*

2        In this claim, Petitioner alleges the prosecutor improperly drew attention to Petitioner's

3    failure to testify. In <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965), the Supreme Court held that "the

4    Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States

5    by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's

6    silence or instructions by the court that such silence is evidence of guilt."

7        As with the previous claims, this claim is totally conclusory and unsupported by any specific

8    facts. Petitioner claims the prosecutor commented on his failure to testify; however, he fails to

9    identify any statements made by the prosecution which unconstitutionally drew attention to his

10   decision not to testify. Therefore, the claim should be rejected for failure to state a claim.

11   *3. Duties of Defense Attorney*

12       Petitioner next argues the prosecutor misled the jury regarding the duties of a defense

13   attorney. Again, Petitioner's claim is wholly unsupported by specific facts and should be dismissed

14   as conclusory. Petitioner fails to state what the prosecutor said that misled the jury or how these

15   statements prejudiced him. This claim should be rejected as well.

16       In sum, Petitioner has failed to present cognizable federal claims. In addition, the claims

17   should be rejected because they are meritless and because there was overwhelming evidence of

18   Petitioner's guilt. Several eyewitnesses testified watching Petitioner shoot at the victims in this case.

19   In light of all the evidence presented, Petitioner's defense theories were hardly believable. The state

20   court denial of the above claims was not contrary to or an unreasonable application of clearly

21   established Federal law, or an unreasonable determination of the facts in light of the evidence

22   presented. <u>See</u> 28 U.S.C. § 2254(d). The claims should be denied.

23                                    **RECOMMENDATION**

24       Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

25   DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

26   Respondent.

27       This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

28   States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

1  of the Local Rules of Practice for the United States District Court, Eastern District of California.

2  Within thirty (30) days after being served with a copy, any party may file written objections with the

3  court and serve a copy on all parties.  Such a document should be captioned "Objections to

4  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

5  filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.

6  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The

7  parties are advised that failure to file objections within the specified time may waive the right to

8  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

9  IT IS SO ORDERED.

10  **Dated:   January 4, 2008**              **/s/ Sandra M. Snyder**
                                          UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28